Okay, Mr. Anderson, we're ready when you are. Thank you, Your Honor. The court entered summary judgment on the basis of its interpretation of automatic. Microsoft has given us another reason to uphold that summary judgment motion, which wasn't decided by the district court, and our court has repeatedly said there's really not any jurisdiction for that kind of a cross-claim. There isn't a cross-claim entitled in that circumstance, so why don't you stick with what the district judge decided and what's under appeal here, which is the automatically unique, if it comes up at all, is an alternative basis for reaching the same result of what the district court decided. Let's go there. I'd be happy to do that, Your Honor. On the issue of automatic, the district court erred, because what it essentially did is equate automatic, the term automatic, with the notion of secrecy. If we look at the district court's opinion, what we see is, the prompt comes up on the Microsoft version, and it says, do you want to activate Windows, and it gives you three options. Only one of the three options even uses the Internet. So how does that automatically determine whether one or more of some plurality of computers is operable for communicating with the Internet? Well, Your Honor, if you elect the other options, the options that Your Honor is pointing to, then you're not... Picking up the phone call and calling a customer service agent? For example. What does that have to do with automatically determining that the Internet's operable? Absolutely nothing. And if you elect that option, you're not even practicing the invention. You're not practicing the invention until you do elect to activate over the Internet. Now, when that happens, and keep in mind, the national patent is very specific about what it requires to be automatic, and there's two sub-processes. One is the determination that the computer is capable of communicating with the Internet. The other is having the ability, not necessarily doing it, but having the ability to transfer identification data over the Internet. And so the issue before the district court was whether those two sub-processes are performed automatically in the accused device. But you have a user prompt interrupting the automaticity here. Well, I disagree with that, Your Honor, because the automaticity, if you will... The user has to do something, right? You agree with that? Yes, of course. How is that automatically determining whether their computer communicates with the Internet? Well, in the same way... Is the user getting under the desk and checking to see whether his computer is connected to the Internet? No, and that's precisely the point. If the user had to do that or had to do some manual step to figure out whether his or her computer was connected to the Internet, then there would be an argument that's not done automatically. But the point is, once the user initiates the action by clicking the mouse and says, I want to activate over the Internet, once that happens and that's the trigger, then the computer automatically determines whether it's operable for communicating with the Internet. In Microsoft's own documents... But that's always automatic then. Every time I turn my computer on, it's automatic then. Because I push the button, it connects to the Internet. Well, today... In every instance, then it's automatic. So your automatic doesn't mean anything. Well, I think it does. If it does, then it must mean what the district court says, right? And the user interruption of that automaticity reaches the same result as the district court did. But, Your Honor, I take issue with the notion that there's an interruption of the automaticity. Because the function that is to be automatic is the determination of, for example, the determination of whether it can communicate with the Internet. That doesn't even start to happen until the user decides to use the program and to activate over the Internet. So there is no interruption. There's nothing that comes in and interrupts it. Well, let me just... I'm getting a little more confused the more we say rather than... Does the user have or not have control over when and whether to operate the... to determine Internet operability? The user does. Ultimately. Ultimately, it has that kind of control. Well, what is that? Well, let me give the court an example. My car has an automatic transmission. But I ultimately control those processes. In fact, I can even control it to the point of looking at my tachometer and listening to the hum of the engine and deciding when a gear change is about to be made. If I want it to make that gear change, I can accelerate, allowing the change to be made. If I don't, I can back off the accelerator and the gear change isn't made. So ultimately, ultimately, I have control over those sub-processes. But that doesn't remove the fact that they're being performed automatically by the machine at the machine level. And in Judge Rader's example, everything that we talk about has this property. Every machine that we call automatic has some sort of trigger that a human user either pushes a button or flips a lever or does something to initiate the processes. And then thereafter, then those processes are performed automatically. If we interpret the term automatic the way the district court did, then almost everything that we describe, every man-made machine that we describe as automatic can no longer be described as automatic because there's always ultimate user control or influence. But the spec talks about this invention. In the abstract, in column 5, line 26 and 27, it says it's not even going to be noticeable to the user. It stresses again, unnoticeable to the user. The user has to initiate this. This isn't unnoticeable. But there's a core point of error, I think, where the district court made a mistake. The court construed the invention improperly. The court read that and says preferably the user isn't going to see it. The court read that provision and said, well, this device has to operate in secret. And the Nash invention is not necessarily designed to operate in secret. It can do that, but it's certainly not required to operate in secret. And what Nash is dealing with here, I think, is a balancing. And this is quite common, is that there's no right or wrong way to do something, but you're balancing competing issues and competing concerns. So, for example, if someone goes in to buy a car and says, I want a really fast car, and they try to sell them a Ferrari, and the buyer says, well, I want something that's really comfortable. I want both. You can't have both in the same car. And I think Nash is recognizing that in some ways, the less the would-be pirate knows about the piracy system, how it operates and what it does, that has some value. However, that has to be balanced against the fact that, and Nash points this out specifically, that has to be balanced against the fact that operating in absolute secrecy, not telling the user what you're doing, may be, one, a violation of the law. Now, at the time this patent was written, this was a very nascent area of the technology, and it was unclear what even the U.S. courts and the U.S. Congress would say about the legality of monitoring someone in complete secret, and Nash recognizes that. Now, I think since that time, there's been some laws that have come out of Congress that would allow that, but it's still an open question in Europe and other places. In addition to that, there's the question of user satisfaction. How will the customers respond to this sort of secret monitoring? So Nash says, in light of all these problems, it may be advisable to get explicit authorization, as opposed to implicit authorization from the user. Now, the only way to get explicit authorization is to, one, communicate to the user, we're going to do this monitoring, and then once the user knows that this kind of monitoring is going to be done, then some sort of representation back from the user saying, okay, I agree to it. But wasn't that the basis of patentability, that the intervening step of saying I'm going to operate automatically isn't practiced? Not at all, Your Honor. This term automatically and this issue of it operating automatically is completely irrelevant to patentability. The patent would have been allowed if this term hadn't even been in there. Now, I think the reason it is in there. But it is in there. It is in there, and it cannot and should not be read out. I'm not arguing that. But what I am suggesting to the Court that it has, it does not go to the core of patentability. It really has nothing to do with patentability. The reason it's in there, I think, is what Judge Rader was alluding to earlier, when he said, well, I turn my computer on, of course it will automatically determine my Internet settings. We expect that today. Given the technology, given the point where the technology is, we expect to turn our computers on and for the computer to determine whether we're connected to the Internet. That wasn't true 10, 15 years ago where people had to take these coupling devices and couple them onto a phone and actually dial in and all these various sorts of things. So what's happened is the technology has moved forward so that we expect these systems to be automated, and there's no reason for them not to be. It is the most efficient way to go. But the point here is the Court lost focus on what really automatic means. You know, it carries, and the Court agreed, and even Microsoft agreed, that it carries its common ordinary meaning. And the common ordinary meaning of automatic is never secret. And it is never that the user has no ultimate control at any level. Because, as we point out in the brief, and as this Court pointed out in CollegeNet, there are often occurrences where, well, almost always, where the user has ultimate control over the device in every automatic machine. And, you know, you take this to its logical extreme. Well, the user even controls that ultimate by determining whether to use the program, whether to turn on the computer. So there's always that kind of control. And to adopt that reasoning, we'll read out the entire meaning of what automatic is intended to convey, and it will take and report limitations that are there. I see that my time has almost up. Yes, we'll save the rest of your time for rebuttal. Thank you, Mr. Anderson. Mr. Brookhart. Yes, ma'am. May it please the Court, I'm Walter Brookhart, and I'm representing Microsoft. With me are Pat Lugin and Rob Rutgers of Shokardi and Bacon and Andy Colbert of Microsoft. There are three issues before the Court today. Two of those, well, I was going to say two of those have been discussed. One of those automatically has been discussed by counsel for Nash. The other one is not interfering. The third issue was in our cross-appeal, addressing Unique. In view of the Nautilus decision, I would submit that if the Court wishes to allow us to argue the issue of Unique, which as an alternative grounds of affirmance. Well, let's start with the ground that's been presented by Mr. Anderson. That's correct, Your Honor. I would like to do that automatically and not interfering first. I think a little help to the Court in understanding the differences between the Nash invention and Microsoft product activation is to look at just what they really cover. The Nash invention and Microsoft product activation have a fundamental difference. That fundamental difference was alluded to earlier by Judge Rader in that the Nash invention is directed to a system that gathers and transmits information. It does it passively. It operates in the background. Hopefully, it's unnoticed so that there's no motivation for the user to try to go in and disable or remove the Nash program. But the spec does use the word preferably, as the other counsel pointed out. Yes, it does use preferably in some places. It does not use it in other places. At the beginning of the summary of the invention, it explicitly states the three terms that I just mentioned, passive use and not interference, not in a preferable mode. If you read the whole tenor of the spec, it is describing what is really a spyware type of system. That is in direct contrast to the Microsoft product activation system, which is really an up-front, it's an interface system, which puts the screen up after you have loaded each program that you purchase and load and will not let you proceed without activating the system. You have a choice. You can either activate on the telephone, you can activate by the internet, or you can put off and activate later. But you have to make the decision. That decision clearly makes the system not automatic. The court defined automatically as acting or operating in a manner essentially independent of external influence or control. The court had to look for a definition because there's no real discussion of automatic in the specification. There's clearly no discussion in the specification or suggestion that automatic means the removal of manual steps. The claims in the Nash Patent, the method claims, are all method claims which are performed by computer programs. Again, as Judge Rader pointed out, those steps are all done by the computer. There's no indication that any of those steps are done in any other fashion. The only reasonable meaning for the word automatic in connection with the claims of the Nash Patent is that it is done in a fashion in conjunction with the gathering and sending of information in a system or in a fashion that is not intended to raise the user's interest. Clearly, that's in contrast to the Microsoft system, which puts a screen up. I refer you to page 28 of the blue brief that shows that screen. I think you've all seen that. The user cannot get beyond that screen without making a choice. But all the user has to do is instruct the computer, all right, proceed automatically to gather and transmit. If the user instructs the computer to activate, then the computer will do the rest of the program, which will gather the information. It will check to see if there's an Internet connection, and it will transmit the data. But if the user never makes that instruction, he will never be able to proceed in the long run and use the program. But if the user issues that instruction, doesn't it then literally read on that clause? No, it does not. Because in order to have a meaning for the word automatic, it has to have something to do with the user having an option to influence or to control the action that's going to follow. That's exactly the position that the district court took, and it's throughout the district court's opinion. We believe that that is correct, that either an action has to be based upon what's disclosed in the specification. And in the Microsoft system, the product activation will not go forward. The user will not be able to use the program after the grace period unless the user has made the choice to activate either through the computer, or through the Internet, or on the telephone. Is this a factual issue or a legal issue? If it's factual, the district court resolved facts on summary judgment, and we've got a problem. And the way you've argued it up to so far has been a factual issue. You've argued what the Microsoft program does. There's no question between the parties as to what the program does. No, but the ultimate question of infringement, whether those facts as understood would be construed to infringe under the claim construction of the district court, that ultimate factual decision is left to a fact finder. And it's probably not adjudicatable on summary judgment, unless you're telling me this is wholly a claim construction issue. In a claim construction context, once the court construed the claim to mean without user influence, I think there's no further fact to see. And so it would be amenable to disposition on summary judgment. There's use of the word secret that's thrown around here. Is it your view that secret is necessarily synonymous with automatic or not automatic? No, secret does not need to be used. In fact, the Nash patent intends it to operate in the background. It intends it to the program to move forward in a, we believe, in a secret matter with spyware. But that is not required by the Nash patent, and we're not suggesting that it is. I think that's clearly a preferred embodiment. But it does contemplate the user not having the option to allow or to disallow the information to be forwarded over the Internet. And that is the automatic control. Nash wants automatically, he wants the information to be gathered and sent, and the user has no control to stop it. The bottom line is a pirate is not going to affirmatively answer a question, yes, send information that I'm a pirate across the Internet. I'd like to move on to the term not interfering, which is also an issue. Not interfering is involved with Claim 12. Is that your cross appeal? No, Your Honor. That is the main appeal. Okay. What's the term on cross appeal? Ma'am? Your Honor? The term on the cross appeal is unique. Okay. Okay. In terms of not interfering, we again believe that the court was correct in its definition of not interfering. The court defined not interfering to be not to create a hindrance or an obstacle. Claim 12 requires that the computer routine, which is installed on the user's computer, not interfere with the use of the underlying programs. The parties, I believe, are in agreement that product activation does interfere. The question, and if you look in the blue brief again at pages 37 and 38, there are screenshots. If you get to the conclusion of the grace period and you have not successfully activated product activation, those screenshots appear. One from Windows is an example, and one from Office is another example. It is clear from those screenshots that with Windows, you have no option to further use the program. You must activate or turn the computer off. That's your only two options. With Office, the two options that you have are to activate or to continue to use the program, but in a highly reduced functionality mode. You're not allowed to do anything in terms of saving or creating new documents. But Mr. Nash is arguing that it's preposterous, I think, or absurd. We're talking about the first routine issue. That seems to be really the issue with regard to this term. And Mr. Nash says that what you're saying is that the first routine is everything that occurs on the user's program, and that that doesn't make any sense. I submit that his position doesn't make any sense when he says that. I think the only thing that we really are at issue here is what is the first routine and does the first routine interfere. If you look at the specification of the Nash patent at column 3, lines 32 to 56, there is a recitation concerning the first computer routine, and it lists just about every step that Mr. Nash discloses in his patent to be performed on the user's computer. He uses first routine to differentiate what's done on the user's computer from the second routine, which is what is done on the server, which collects the information at the other end of the Internet. Claim 12 only provides that a first routine is installed on the computer, and then it goes on and provides that that first routine not interfere, and it also goes on and provides that one of the functions for the first routine is to determine the unique hardware identifier. Let me just tie that back to Judge Rader's question about summary judgment and questions of fact, questions of law. This case seems to have been teed up as a summary judgment, just an infringement question and not on a claim construction. It seems like on basic claim constructions, there was no dispute. But with the exception of unique, that's correct. Right. But with respect to routine, what we've been talking about here and what the briefs are talking about in terms of what's the first routine and what's not the first routine, is that a question of fact or is that a question of law, given the term in the spec? I think if the parties had understood at the Markman hearing that there was going to be an issue over first routine, that that would have been presented as a question of claim construction as to the meaning of first routine. I submit that there is no discrepancy as to the meaning of first routine. It's clearly indicated in the NASH plan that the first routine applies to that which is done in connection with the anti-piracy program. You may say that there's no discrepancy, but as you just acknowledged in our earlier conversation, Mr. Nash is calling your view of what consists of the first routine is absurd and you're saying his is absurd. So there clearly is a dispute, is there not, in terms of what activities constitute the first routine, right? At this point, there's a dispute as to what the first routine means and I guess an alternative way of phrasing that would be a dispute as to what falls within the first routine after you define what it means. We believe that the first routine is clearly defined in the NASH patent as that which is done by the anti-piracy program on the user's computer. The claim 12 uses the term comprising which leaves it open-ended. There's no reason to restrict it in any fashion. And once that definition of first routine is employed, there's no question, there's no dispute as to the facts as to what the Microsoft system does. Clearly, the interference occurs from the user's computer. As an example, if the user never attempts to even activate, he never authorizes an activation across the Internet, then his computer will be shut down, clearly an interference. But doesn't it shut down in your system also? Your Honor, I didn't understand the question. When the product activation program shuts down, doesn't it shut down the Windows also? Product activation will stop the use of Windows and give the user the choice of activating or at that time shutting down the computer. It does not shut down Windows itself. It will sit there with that screenshot until the user makes a choice. So the distinction, in your view, is whether it's automatic again. No, the distinction with this in terms of not interfering is that the first routine, which is the routine on the user's computer, puts up a screenshot from which the user cannot escape  Okay. Am I correct in understanding the Court does not wish to hear an argument on E.D.? We have 30 seconds left, so I think you're correct. Thank you, Your Honor. Okay. Thank you, Mr. Bruckheit. Mr. Anderson. Thank you, Your Honor. I believe that this Court's decision in the CollegeNet case that came out last summer is controlling and indistinguishable from the instant case. In the CollegeNet case, the same argument was advanced in that... Different claims. There were different claims. That's true, Your Honor. Well, that's a pretty significant difference, isn't it? I don't believe it is because... I was on that case as well. We're talking about their conveying information in form that can be used by various universities once it's put up on the Internet. Yes, Your Honor. That's somewhat different than whether a user prompt interrupts the conveyance of security information. But the same argument was advanced, I believe, in that case, Your Honor. The argument was advanced that by having to click a mouse, the user has ultimate control over whether this information is populated to these other applications. That was the case in CollegeNet. Here, the argument is because the user has an ultimate control of whether the user even activates all over the Internet. And if the user chooses not to activate over the Internet, then, of course, these sub-processes never occur. Since the user has that kind of control, the argument is advanced by Microsoft and it was brought into by the District Court, but that means it's not automatic. And the problem is that what's happened is there's been an attempt, I think inaccurately, to characterize the invention and then stretch automatic around that mischaracterization. Because if you look, we look first at the question of, the very issue of, well, did the court adopt an incorrect definition? And I think a more elegant definition would have been the one that the court dealt with in the CollegeNet case. We concluded that the court's definition was not incorrect because it came straight out of the American Heritage Dictionary. And when you look at that dictionary and the examples that it gives,  you can see from the definition that the user doesn't have any ultimate control. And they give examples like an automatic pilot or a machine gun or automatic machine gun. These types of examples are found in the dictionary, in the very dictionary from which the court extracted these definitions. Without external influence. Isn't there some external influence from the user? There's no more external influence in this case than there is in every other case. You can choose to abort the whole thing. You can call them up on the phone. Yes, of course. And nothing goes over the internet ever. But in the case of an automatic pilot, Your Honor, you can choose to abort that entire process. You can flip it off and fly the plane yourself. In the case of... What if I've got an automatic transmission, to use your example, but one of those European ones that I can decide when it switches gears? Yes. It would still be an automatic transmission or not? Because I'm manually shifting the gears. You would still have an automatic transmission. I suppose that if you shifted the gears physically, you would argue that now I'm operating in a manual mode. But I think the issue here is, the first question comes up, what is it that has to be automatic? And there's specific... It doesn't say the whole process is automatic or it self-initiates. It initiates automatically. What it says is these two sub-processes have to be automatic. And what's interesting is Microsoft itself, in its own documents on its website, says Microsoft product activation performs these very processes automatically. We automatically determine your internet set. We automatically determine whether you're connected to the internet. If you're not, we try to find your modem and make a connection. And if you are, we go ahead and process the connection and transfer the data. So even Microsoft says... I think this is telling because if we ask skilled artisans what is meant by this term automatic, without any gloss on this, they'd say, of course, that there's going to be some amount of user control. Pushing a button, that sort of thing, doesn't make it non-automatic. So in conclusion, I do think that the same argument was advanced in the CollegeNet case. I think that despite what Mr. Brookhart says, he says this notion of secrecy is not... he doesn't support it. Here's what the district court said. It says, under NPA, the user is clearly aware that immediately following a click indicating the send, the process will begin using the internet to activate the program. And this is the basis of the court's decision. Now this, as a statement of fact, is true. But I submit to the court that it's irrelevant to the question of automatic. The level of the user's knowledge or awareness does not make something be more or less automatic. Thank you, Mr. Anderson and Mr. Brookhart. The case is taken under submission.